[Cite as *In re R.R.*, 2021-Ohio-1620.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**LOGAN COUNTY**

IN RE:

  R.R.,             CASE NO. 8-20-26

DEPENDENT CHILD.

                **O P I N I O N**

[KIRSTEN T.G. - APPELLANT]

**Appeal from Logan County Common Pleas Court**
**Family Court Division**
**Trial Court No. 18 CS 0039**

**Judgment Affirmed**

**Date of Decision: May 10, 2021**

APPEARANCES:

  *Alison Boggs* **for Appellant**

  *Chelsea R. Brown* **for Appellee**

**SHAW, J.**

{¶1} Mother-Appellant, Kirsten T.G. ("Mother"), appeals the June 8, 2020 judgment of the Logan County Court of Common Pleas, Family Court Division, granting the motion for permanent custody of her child, R.R., filed by Logan County Children Services (the "Agency") and terminating her parental rights.

*Relevant Facts and Procedural History*

{¶2} The record indicates this case originated when Mother, a minor, appeared for a hearing on allegations that she had committed violations of the terms of her juvenile probation. R.R., the child who is the subject of this appeal, was born to Mother in 2017. The record of the probation violation hearing itself is not before us. However, at the subsequent permanent custody hearing, Jamie McNeal, a case investigator for the Agency, testified that the Agency first became involved with Mother and R.R. upon receiving reports on August 2, 2018 that Mother had taken "half a bottle of prescription medication claiming she did not want to be here while being the only caregiver for R.R. at the time." (Doc. No. 210 at 27).

{¶3} Upon receiving the referral, McNeal contacted paternal grandfather, Mother's father, due to Mother being a minor, and obtained his permission to speak with Mother about the allegations. McNeal stated that the Agency was aware of Mother's probation violation and her potential for placement in a Juvenile Detention Center ("JDC"). Prior to the probation hearing, McNeal recalled that "we had

discussed her coming up with a safety plan [regarding custody of R.R.], finding a party willing to work with the agency; however, [Mother] did not find anybody, so at that point Judge Martin did order her into JDC and ordered R.R. dependent and at that point they came into our care." (Doc. 210 at 28).

{¶4} The trial court found Mother had violated her probation and ordered her to be placed in JDC for 22 days. As testified by the case investigator noted above, it appears that Mother was the sole caregiver for R.R. and that no suitable kinship placements could be established for immediate custody of R.R. Moreover, R.R.'s father, Adrian R. ("Father"), was also a minor at the time and on juvenile probation.

{¶5} As a result, on August 6, 2018, following the probation violation hearing, and in lieu of securing the filing of a complaint in dependency, the trial court issued a judgment entry/ex parte order "finding" R.R. to be dependent, "designating" the Agency as R.R.'s temporary legal custodian, and laying out the means and opportunities for Mother to challenge any of those matters at a subsequent hearing. (Doc. No. 1).

{¶6} On August 30, 2018, the trial court appointed a Guardian Ad Litem ("GAL") to the case.

{¶7} On August 31, 2018, the trial court issued a judgment entry which advised the parties that "[t]his action involves the potential termination of parental

rights and has strict time limits" and also appointed an attorney to represent Mother in the dependency case. (Doc. No. 6).

{¶8} On September 5, 2018, the trial court issued a "SUMMONS" notifying the parties, counsel and the GAL of a "dispositional hearing" set for October 17, 2018, and again apprising the parties of the potential consequences and dispositions available to the court "if the court makes an adjudication of dependency" at the upcoming hearing. (Doc. No. 10).

{¶9} On October 17, 2018, the trial court held the dispositional hearing. At the hearing, Mother and her counsel raised no objection or challenge to the court's prior finding of dependency and the parties agreed to continue R.R.'s placement in the temporary custody of the Agency with the parents having supervised visitation with the child. The trial court also expressed its intention to have the parties to attend regularly scheduled status conferences with the court to hold the young parents "more accountable" "instead of waiting a year or six months" to return to court. (Doc. No. 206 at 12).

{¶10} On December 4, 2018, the trial court issued a judgment entry journalizing its disposition of R.R. into the temporary custody of the Agency as a dependent child, reflecting the parties' agreement at the dispositional hearing and their failure to challenge the initial findings of dependency made in the August 6, 2018 judgment entry/ex parte order.

{¶11} The Agency subsequently devised a case plan to address the parents' mental health and substance abuse issues, as well as providing them with parenting classes.

{¶12} In the Spring of 2019, Mother gave birth to a second child, H.G. Genetic testing confirmed Father to be the biological father of H.G., who was also placed in the temporary custody of the Agency and added to the case plan.[1]

{¶13} On September 23, 2019, the Agency filed a motion for permanent custody of R.R. The Agency alleged that R.R. had been in its temporary custody for twelve or more of a consecutive twenty-two month period pursuant to R.C. 2151.414(B)(1)(d), and requested a hearing on its motion for permanent custody.

{¶14} On October 14, 2019, the Agency filed a motion for approval of an amended case plan to reflect Father's wishes to discontinue services from the Agency with respect to the pending cases involving R.R. and H.G. The trial court subsequently granted the motion and removed Father from the case plan. The record indicates that prior to this motion, Father had stopped participating in the case, had failed to appear at hearings, and had ceased communication with his counsel.

{¶15} On December 9, 2019, the GAL filed a report recommending the trial court grant the Agency's motion for permanent custody of R.R. based upon

---

[1] The custody of H.G. is not at issue upon this appeal.

Mother's lack of compliance with the case plan objectives, Father's lack of participation, and R.R.'s need for a legally secure permanent placement.

{¶16} On February 4, 2020 and on April 9, 2020, the trial court conducted hearings on the Agency's motion for permanent custody.[2] Multiple witnesses testified for the Agency, including individuals involved in assisting Mother with completing objectives in the case plan, R.R.'s foster parent, and Mother's Juvenile Probation Officer. The Agency also called Mother upon cross-examination.

{¶17} On June 8, 2020, the trial court issued a judgment entry granting the Agency's motion for permanent custody of R.R. Specifically, the trial court found that the Agency established by clear and convincing evidence that R.R. cannot be safely placed in the care of either parent within a reasonable amount of time or should not be. The trial court further found that the evidence clearly and convincingly demonstrated that granting permanent custody of R.R. to the Agency is in her best interest.

{¶18} Mother filed this appeal asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT'S DETERMINATION THAT R.R. WAS A DEPENDENT CHILD IS VOID AB INITIO AS THE TRIAL [COURT] NEVER HAD SUBJECT MATTER JURISDICTION, WHICH PREVENTS THE COURT FROM GRANTING PERMANENT CUSTODY OF R.R. TO THE AGENCY.**

---

[2] Notably, there was a hearing on the permanent custody motion scheduled for March 3, 2020. However, Mother failed to appear at that hearing and a warrant was issued for her failure to appear. Mother appeared at the following hearing and the trial court deemed the warrant moot.

**ASSIGNMENT OF ERROR NO. 2**

**THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AMOUNTED TO AN ABUSE OF DISCRETION.**

**ASSIGNMENT OF ERROR NO. 3**

**THE AGENCY FAILED TO USE REASONABLE EFFORTS TO REUNIFY [MOTHER] WITH HER DAUGHTER.**

*First Assignment of Error*

{¶19} In her first assignment of error, Mother does not directly challenge the trial court's judgment entry granting the Agency permanent custody of R.R., which is the subject of this appeal, but instead claims that the trial court erred in initially finding R.R. to be dependent without a complaint alleging R.R.'s dependency first being filed with the court.

{¶20} Specifically, Mother claims that because this case did not originate with a dependency "complaint" filed pursuant to R.C. 2151.23(A)(1), the juvenile court's exclusive subject-matter jurisdiction pertaining to a dependency action was never invoked. As a result, Mother argues that any determination of dependency and all subsequent orders based thereon in this case, up to and including all of the orders and actions of the court pertaining to temporary and permanent custody over the next two years, are void, and thereby subject to the collateral attack Mother now makes in this appeal.

{¶21} In the alternative, Mother argues that even if the dependency findings, adjudications and dispositions set forth in the trial court's judgment entries of August 6, 2018 and December 4, 2018 are not considered void *ab initio*, that the failure of the trial court to follow the procedure for filing a complaint in dependency set forth in R.C. 2151.23(A)(1), deprived her of important due process rights necessary to: (1) fully present evidence or otherwise challenge the court's determination of dependency; or (2) apprise her that any of her actions in this case could ever lead to the termination of her parental rights

*The Trial Court's Determination of Dependency*

{¶22} Because the actions of the trial court from the initial judgment entry/ex parte order of August 6, 2018 through the final dispositional order of December 4, 2018 are at the heart of Mother's claims, we will address each of those actions in detail.

{¶23} As alleged by Mother, there is no dispute in this case that this dependency action was initiated by the filing of a "Judgment Entry" on August 6, 2018 and not by anything captioned as a "Complaint." However, any resulting claim that the trial court therefore commenced this action with an "adjudication of dependency" is misleading.

{¶24} On the contrary, the August 6, 2018 "Judgment Entry" at issue in this case, is described by its own language as merely an "Ex Parte Order," which despite

containing a preliminary "finding" of dependency and "designation" of the Agency for temporary custody, clearly indicates the trial court's intent to *open* a dependency case and *initiate* the process for determining these matters rather than rendering any final adjudication of them.

{¶25} In sum, the language of the August 6, 2018 "Judgment Entry" clearly resembles the language of a "Complaint" or temporary order at best, far more than a judgment entry, and more importantly perhaps, appears to have been clearly treated as such by the trial court in subsequent proceedings leading to its final judgment of disposition entered on December 4, 2018.

{¶26} Notably, in the section of the entry immediately following the trial court's reference to dependency and temporary custody, the August 6, 2018 "Judgment Entry" goes on to state as follows:

> **The Court HEREBY ORDERS that for the purposes of judicial economy *this matter shall be opened as a dependency case* with the case number 18 CS 39. *Any future filings pertaining to the dependency of the child* shall be filed using the dependency case number. (Emphasis added.)**
>
> **"Please take notice that Logan County Children's Services was awarded temporary legal custody by way of an *Ex Parte Order* (emphasis in original) which you have the right to challenge. *You may file a counter affidavit within fourteen (14) days* from the service of the related pleadings. Upon proper written request, *the Court shall grant the party so requesting an oral hearing to review orders* related to temporary spousal support, child support, or order allocating parental rights and responsibilities for the care of children, within twenty-eight (28) days. (Emphasis added.)**

(Doc. No. 1).

**{¶27}** Next, on August 31, 2018, the trial court subsequently ordered the appointment of indigent counsel for Mother. (The court had previously appointed a GAL for the child.) Notably, in terms of apprisal to the parties as to the consequences at stake, this judgment entry, which was served both upon Mother and her newly appointed counsel, as well as the GAL, stated in the very first line of the entry:

> **This action involves the potential termination of parental rights and has strict timeline requirements.**

(Doc. No. 6).

**{¶28}** Next, on September 5, 2018, the trial court issued a "SUMMONS" notifying the parties to appear for "dispositional" hearing. Notably again however, far from merely notifying the parties of an upcoming hearing for the disposition of a dependency that has already been adjudicated, the language of this summons specifically refers to issue of dependency as something which *remains to be finally adjudicated if true,* at the "dispositional" hearing and, at the same time, gives further and explicit apprisal to the parties as to the potential for the termination of parental rights at stake in the upcoming hearing, if such an adjudication were to be made, as follows:

> **YOU ARE NOTIFIED AS FOLLOWS:**
>
> \* \* \*

**2.** *If the court* **(Emphasis added) makes an <u>adjudication of dependency, neglect or abuse</u> (finds the allegations contained in the attached complaint are true) this may result in one of the following: (Emphasis in original.)**

**A.    The granting of <u>permanent custody</u> which permanently divest (does away with) the parents of their parental rights and privileges, duties and obligations, including the right to consent to an adoption of the children; (Emphasis in original.)**

**B.    An order of <u>temporary custody</u> that will cause the removal of the child from your legal custody until the court terminates the order of temporary custody or permanently divests the parents of their parental rights. (Emphasis in original.)**

(Doc. No. 10) (emphasis sic).

{¶29} Notwithstanding the clear advisements for making direct evidentiary and legal challenges to either the finding of dependency or the designation of temporary custody set forth in the judgment entry of August 6, 2018, as well as the clear notice set forth in the Judgment Entry of August 31, 2018 appointing counsel, and again in the SUMMONS of September 5, 2018, that the potential termination of parental rights was at stake, Mother appeared with counsel at the dispositional hearing on October 17, 2018 and neither objected to nor challenged the trial court's initial finding or ultimate adjudication of R.R. as a dependent child or the order of R.R. into the temporary custody of the Agency as a dependent child.  Instead, at the hearing, Mother and counsel entered into an agreement to the continuation of R.R.'s placement in the Agency's temporary custody.

*Jurisdiction*

{¶30} Turning now to the impact of the foregoing actions of the trial court upon the jurisdictional claims of Mother. The juvenile court is vested with subject matter jurisdiction over permanent custody proceedings involving abused, neglected, and dependent children under the Ohio Revised Code. *See* R.C. 2151.23(A)(1). Additionally, the juvenile court acquires personal jurisdiction over a party in a custody proceeding once the party has been duly served with summons and provided notice of the proceedings. *In re Miller*, 33 Ohio App.3d 224, 226 (1986), citing, *In re Frinzl*, 152 Ohio St. 164, 177 (1949). Jurisdiction can also be acquired over a party in the absence of proper service when the party voluntarily participates in the proceedings. *In re F.L.*, 8th Dist. Cuyahoga No. 83536, 2004-Ohio-1255, ¶ 9.

{¶31} " 'Once a tribunal has jurisdiction over both the subject matter of an action and the parties to it, "* * * the right to hear and determine is perfect; and the decision of every question thereafter arising is but the exercise of the jurisdiction thus conferred * * *." ' " *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, ¶ 26, quoting *State ex rel. Pizza v. Rayford*, 62 Ohio St.3d 382, 384 (1992), quoting *Sheldon's Lessee v. Newton*, 3 Ohio St. 494, 499 (1854). Moreover, "when a specific action is within a court's subject-matter jurisdiction, any error in the exercise of that jurisdiction renders the court's judgment voidable, not void." *Id.*

citing, *Pratts*, 102 Ohio St.3d 81, 2004-Ohio-1980, ¶ 12. Generally, a voidable judgment may be set aside only if successfully challenged on direct appeal. *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 28.

{¶32} In sum, in terms of void versus voidable, it is clear that the status of obtaining specific jurisdiction over a dependency action is quite different where the Juvenile Court has already obtained the legitimate general jurisdiction over the parent and child, as opposed to where there is no prior jurisdiction over the parties prior to the dependency action.

{¶33} In the instant case, the record reflects that the trial court exercised its proper authority under R.C. 2151.31(A)(3)(b) to take custody of R.R. at Mother's probation violation hearing upon ordering Mother to the custody of JDC for 22 days for a probation violation.[3] *See also* R.C. 2151.23(A)(1)(8)(specifically conferring jurisdiction to the juvenile court "[c]oncerning any child who is to be taken into custody pursuant to section 2151.31 of the Revised Code, upon being notified of the intent to take the child into custody and the reasons for taking the child into custody

---

[3] Specifically, R.C. 2151.31(A)(3)(b) states as follows:

> **(A) A child may be taken into custody in any of the following ways:**
> * * *
> **(3) By a law enforcement officer or duly authorized officer of the court when any of the following conditions are present:**
> * * *
> **(b) There are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate or threatened physical or emotional harm * * *.**

* * *"). And in fact, Mother makes no argument that personal jurisdiction is lacking in this case.

{¶34} As previously noted, the "when a specific action is within a court's subject-matter jurisdiction, any error in the exercise of that jurisdiction renders the court's judgment voidable, not void." *Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, ¶ 26. "If a judgment entry is voidable, then it must be challenged on direct appeal, or else principles of res judicata will apply, whereas a 'defendant's ability to challenge an entry at any time is the very essence of an entry being void, not voidable.' " *State ex rel. Romine v. McIntosh*, — Ohio St.3d — 2020-Ohio-6826, ¶ 12 quoting, *Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, ¶ 18.

*Standard of Review*

{¶35} The juvenile court's determination regarding its subject matter jurisdiction implicates a question of law which this Court reviews *de novo*. *Lorain Cty. Children Servs. v. Gossick*, 9th Dist. Lorain No. 13CA010476, 2014-Ohio-3865, ¶ 10

*Analysis*

{¶36} At the outset, we concur with Mother that the proper procedure for initiating a dependency action in the juvenile court as set forth in R.C. 2151.23(A)(1) was not followed in this case. As such, we do not condone or excuse the failure of the juvenile court to strictly follow the statute. Nor do we condone or

endorse the practice of utilizing methods such as the ex parte orders and notifications employed by the trial court in this case, regardless of the due process and apprisal rights afforded to the parties, even as an apparent expeditious alternative to the clear path provided in R.C. 2151.23(A)(1) for the initiation of a dependency action, especially in a statutory court such as the juvenile court. As a result, we can only conclude that the court did not properly initiate the dependency action in this case and therefore clearly committed error in that regard.

{¶37} However, in terms of the jurisdictional allegations raised in the first assignment of error, the specific issue before this Court is whether by initiating the dependency action in this case without the filing of a proper "Complaint," the jurisdiction of the juvenile court over this dependency action was *never invoked at all*, rendering all of the subsequent actions and judgments of the juvenile court *void ab initio*,—or whether by improperly initiating the dependency action, the trial court, which had already acquired legitimate jurisdiction over the mother and the child—*and the circumstances surrounding them*—via the probation violation hearing, merely committed error in the further *exercise of its jurisdiction*, rendering those judgments of the court only *voidable*.

{¶38} Based on our earlier analysis of the actual wording and language of the dependency related documents filed by the juvenile court, the somewhat unique and exigent manner in which the initial jurisdiction over the parties had already been

obtained by the court in this instance via the probation violation hearing, the significant due process, opportunity for hearing, and apprisal rights afforded to Mother by the Juvenile Court leading up to the ultimate adjudication of dependency and placement of R.R. into the temporary custody of the Agency, it is our conclusion that the actions of the Juvenile Court in this particular dependency action, constituted a voidable error in the exercise of its jurisdiction, and not a void failure *ab initio* to invoke any jurisdiction over the case.

*Res Judicata*

{¶39} In addition to not mounting any direct challenges to the dependency and custody determinations at the inception or during the pendency of this action in the trial court, despite many initial advisements of such opportunities set forth in the court's entries as discussed earlier, we also note that Mother failed to appeal either the August 6, 2018 Judgment Entry finding R.R. dependent and designating the Agency as her temporary legal custodian or the trial court's December 4, 2018 judgment entry journalizing its final disposition of R.R. to the temporary custody of the agency as a dependent child.

{¶40} The Supreme Court of Ohio has held that " '[a]n adjudication by a juvenile court that a child is "neglected" or "dependent" as defined by R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a "final order" within

the meaning of R.C. 2505.02 and is appealable to the court of appeals pursuant to R.C. 2501.02.' " *In re H.F.*, 120 Ohio St. 3d 499, 502, 2008-Ohio-6810, ¶ 8, quoting *In re Murray*, 52 Ohio St.3d 155 (1990), at syllabus.

{¶41} Therefore, while the mere "finding" of dependency in the Juvenile Court's August 6, 2018 judgment entry or the mere "designation" of temporary custody with the Agency, may well not have constituted final appealable adjudications, at the very latest, the trial court's December 4, 2018 judgment entry ordering R.R. into the temporary custody of the Agency as a dependent child, clearly did constitute a such a final, appealable order and a timely appeal of that judgment was required be filed within 30 days of its issuance.

{¶42} Accordingly, as we have determined the Juvenile Court's 2018 judgment entries finding and determining R.R. to be a dependent child and placing her in the temporary custody of the Agency, constituted an error in the *exercise* of the court's jurisdiction, and not a void *failure* to invoke any jurisdiction, they are voidable and subject to be challenged *only upon direct appeal*. Because Mother failed to file direct appeals from either of these judgment entries, the issues Mother now raises relating to the determination and disposition of the dependency are subject to *res judicata* and are not properly before us in this appeal from the trial court's judgment entry granting the Agency's motion for permanent custody of R.R.

*Best Interests of the Child*

**{¶43}** Despite our unequivocal finding that the trial court did proceed erroneously in failing to strictly comply with R.C. 2151.23(A)(1), we find no other merit to Mother's contention that the manner in which the trial court proceeded in this case constituted reversible error.  As previously noted, the trial court properly exercised its authority to take immediate custody of R.R. at Mother's probation violation hearing under R.C. 2151.31(A)(3)(b).  The record further indicates that Mother was accorded significant due process and apprisal of the potential consequences to her parental rights throughout the dependency, temporary, and permanent custody process, by providing her notice and meaningful opportunities to be heard, as well as representation at every stage of the proceedings.

**{¶44}** Finally, we would note that over the next two years following these initial entries and hearings, Mother was also allocated substantial resources by the Agency to assist her with her mental health and substance abuse issues, which were the primary concerns sustaining R.R.'s removal from her home.  Nevertheless, despite these opportunities and reasonable efforts, Mother's participation in the case was sporadic at best and failed to rise to the level necessary to permit R.R.'s return to Mother's custody within a reasonable period of time.  In addition, it is noteworthy that the last eight months of this period *followed the motion for permanent custody*,

which most clearly apprised the parties of what was at stake regarding the possible termination of parental rights.

**{¶45}** Bearing in mind that the consideration of the best interest of the child is paramount in these cases, including procuring a legally secure permanent placement for the child, it is apparent that requiring a party to timely raise issues concerning the initial determination of dependency prevents the dependent child from unnecessarily languishing in the system for years at a time while the parent is permitted to collaterally attack the dependency adjudication years later at the permanent custody stage after failing to raise those challenges at the time or fully participate in the case over all that time, despite having every opportunity to do so.

**{¶46}** Based on the foregoing, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶47}** In her second assignment of error, Mother argues that the trial court's decision to grant the Agency's motion for permanent custody of R.R. is against the manifest weight of the evidence. Specifically, Mother argues that the trial court failed to give due consideration to her lack of maturity, her suffering from depression after the recent death of her mother, and her lack of community and family support. In essence, Mother maintains that she should have been given more time to comply with the case plan prior to the Agency filing a motion for permanent custody.

*Standard of Review*

{¶48} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶49} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is: "[T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, (1986).

{¶50} In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine

whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). *Accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) (Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M., M.M., D.M., B.M.*, 4th Dist. Athens Nos. 12CA43, 12CA44, 2013-Ohio-3588, ¶ 55 (4th Dist.).

{¶51} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. No.2016CA00124, 2016-Ohio-7057, ¶ 20, citing *Miller v. Miller*, 37 Ohio St.3d 71 (1988). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "exceptional case in which the evidence weighs heavily against the [decision]." *State v Thompkins*, 78 Ohio St.3d 380, 387 (1997).

*Evidence Adduced at the Permanent Custody Hearing*

{¶52} The Agency presented the following evidence in support of its motion for permanent custody of R.R. India Slayback testified that she was Mother's probation officer for two years and eight months beginning in 2016. She explained that Mother was placed on probation for unruly truancy. Slayback recalled the main concerns were Mother's mental health and marijuana use. Mother also did not have a familial support system as her father (R.R.'s paternal grandfather) appeared to have difficulties supporting her mentally and emotionally after the death of her mother.

{¶53} As conditions of her probation, Mother was to attended counseling regularly and abstain from using marijuana. Slayback recalled that Father (R.R.'s father) was also on juvenile probation at the time, and also had mental health and substance abuse concerns. She listed several things she did to assist both Mother and Father with these issues. She provided both juveniles with transportation to and from school and counseling appointments, devoted considerable time and resources to help them with graduating from high school, and enrolled them in substance abuse programs. However, despite these efforts, both Mother and Father were unable to sustain any long-term sobriety or counseling regimen, which resulted in numerous violations of their juvenile probation as well as lengthy probation terms before they were successfully discharged.

**{¶54}** Slayback stated that she filed a probation violation notice with the juvenile court in July 2018, after Mother repeatedly failed drug screens and failed to consistently attend counseling sessions. R.R. was born to Mother during the time she was on juvenile probation. Slayback recalled that both Mother and Father were eventually successfully terminated from probation after producing multiple months of clean drug screens and consistently attending counseling. She also noted that at that time the Agency had become involved in the instant case so she felt comfortable releasing Mother and Father from probation since the Agency could provide them similar services through the dependency case.

**{¶55}** Ryan King, the ongoing case worker for the Agency, also testified in support of the motion for permanent custody. King stated that he first became involved in the case in December of 2018. He reiterated that the primary concerns with Mother were her mental health, substance abuse, and her ability to supervise R.R. He recalled that maintaining communication with Mother was at times difficult, but he was still able to hold home visits with her once a month and also communicate with her numerous times a month through the phone or email. King stated that while Mother did complete parenting classes as required, her compliance with other aspects of the case plan was inconsistent and sporadic.

**{¶56}** Specifically, Mother only attended one of nine medical appointments for R.R. since the initiation of the case with the Agency. King noted that Mother's

lack of stable housing also presented a substantial concern and hindered her progress in working toward reunification with R.R. King testified that Mother had lived in several different places during the court proceedings. The record reflects that Mother's housing instability was due in part to Mother's involvement in at least two romantic relationships with partners who either allegedly used illicit drugs and/or committed domestic violence against her. At the time of the permanent custody proceedings, Mother was living with her father (R.R.'s paternal grandfather). However, the Agency had determined that paternal grandfather's home was not appropriate for R.R. because of various unaddressed safely hazards which posed a threat to a young child. Notably, the Agency offered to assist Mother with securing an apartment. However, Mother did not avail herself of that opportunity. King further noted that Mother attempted to find gainful employment, but had problems retaining a job. Mother had an estimated eight different jobs during the pendency of the case.

{¶57} As to the primary concerns with Mother, namely her mental health and substance abuse, King recalled that Mother had several months of being drug-free at the beginning of the Agency's case. However, Mother's produced a positive drug test in February of 2019 and Mother admitted to using marijuana shortly after she was released from juvenile probation in January 2019. King stated that Mother continued to test positive for THC until April of 2019. After that point she had

produced negative drug screens until December 2019, when she again tested positive for THC and Amphetamine. The record also indicates that Mother admitted to using marijuana in January 2020, one month prior to the commencement of the permanent custody hearings.

{¶58} King stated that the Agency also provided Mother with counseling to help her with depression, which was a significant factor affecting her ability to safely parent R.R. Mother only sporadically attended these counseling sessions throughout the majority of the case. However, King acknowledged that after the permanent custody motion was filed, and near the time of the hearings on the motion, Mother began to attend counseling again. The Agency submitted Exhibit B, which is a record of Mother's counseling attendance. Testimony regarding Exhibit B indicated that from August 8, 2018, when this case was initiated, to November 14, 2019, when Mother was discharged due missed appointments, Mother attended 31 of the 66 scheduled appointments. Exhibit B further demonstrated that Mother reengaged counseling services on January 14, 2020, weeks before the trial court conducted the permanent custody hearings, and that she had only attended three of the six scheduled appointments from that time to April 9, 2020, when this evidence was presented at the permanent custody hearings.

{¶59} King further stated that despite being given extended visitations, Mother did "not wholeheartedly" exercise her visitations with R.R. and failed to

attend all the visitations available to her. (Doc. No. 210 at 96). King also noted that the Agency frequently changed the visitations to accommodate Mother's work schedule. Nevertheless, Mother only attended approximately half of the visitations. Specifically, Mother exercised 56 of the 103 visits offered. Several of these missed visitations were no shows or last minute cancellations, which resulted in R.R. being transported to the visitation center with no visit taking place. Eventually, the Agency put a protocol in place to reduce the amount of trauma to R.R. and H.G. (R.R.'s sibling), requiring Mother to call to confirm and actually be present before the foster parents were contacted to bring the children to the visitation. Mother claimed that her missed visitations were due to having no transportation, but King testified that he informed Mother he was willing to help her with that issue if she gave him notice ahead of time by providing her gas cards and transportation. However, for reasons not explained, Mother never utilized any of the transportation assistance offered by the Agency.

{¶60} With respect to Father, King explained that Father failed to exert any significant effort to meet the case plans objectives put in place by the Agency to help him be reunited with R.R. Father's visitations with R.R. were intermittent, with visitations being suspended after he failed to exercise them for several consecutive months. Eventually, Father asked to be removed from the case plan and to discontinue receiving services from the Agency. At the time of the

permanent custody hearings, Father had ceased communication with his counsel and his whereabouts were unknown.

{¶61} King stated that the Agency's primary concerns for R.R. were based on "self-protection and the—basically the need for an appropriate adult in the child's life to meet those daily basic needs of the child, such as food, clothing, shelter, medical care, education, safety and supervision." (Doc. No. 210 at 102). He explained that he did not believe either parent demonstrated the current capability to support or to safely parent R.R. in their homes. The Agency reviewed several potential kinship options or alternatives to permanent custody, but they were either inappropriate or the potential custodian withdrew their application for consideration. King testified that both Mother and Father had limited familial support systems who were unable to help either of them safely parent R.R.

{¶62} Regarding two-year-old R.R., King testified that she had thrived in her foster home where she had lived for the prior eighteen months. He described R.R. as being very bonded with her foster parents and her younger sibling, H.G., who was also placed in the home. Sara Hilgefort, R.R.'s foster parent and a nurse, also testified for the Agency. She recalled that when she first received R.R. in her care in August of 2018, R.R. was approximately nine-months-old. She recalled that R.R. was not up to date on her immunizations and that she had concerns with R.R.'s development because R.R. did not crawl, roll, or move "around a whole lot. She

would mostly just kind of lay and she would lay where she was put." (Doc. No. 210 at 162). She described R.R. as initially not being able to bear her weight on her legs. Hilgefort explained that upon R.R. being placed in her care she immediately scheduled appointments to update R.R.'s immunizations and contacted a social worker to have R.R. assessed by an early intervention specialist. Hilgefort stated that she began performing exercises on R.R. legs to strengthen them and R.R. was crawling within three weeks of being in their care. Hilgefort described R.R. as active and now "completely on track" physically. (Doc. No. 210 at 164). Hilgefort testified that R.R. is extremely bonded to her and her husband and the other children in the home.

*Statutory Procedure and Analysis*

{¶63} Revised Code 2151.414 sets forth a two-part analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under this statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that: (1) any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists; and (2) permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D). *See In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794.

*1.    Whether R.R. cannot be placed with either of her parents within a reasonable time or should not be placed with her parents under R.C. 2151.414(B)(1)(a)*

{¶64} Under the first part of permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three occasions (R.C. 2151.414(B)(1)(e)); or, when none of these factors apply, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (R.C. 2151.414(B)(1)(a)).

{¶65} At the outset, we note that the Agency's motion for permanent custody alleged that R.R. had been in its temporary custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). The trial court in its judgment entry granting permanent custody noted that "R.R. was in the temporary custody of LCCS for thirteen months (13) at the time of the filing of the motion for permanent custody. Upon inquiry by the Court, no one challenged the dates thus stipulating to a required condition under R.C. 2151.414(B)(1)(d)." (Doc. No. 193 at 6). Despite this finding, the trial court proceeded to analyze the factors R.C.

2151.414(E), which are relevant to whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" under R.C. 2151.414(B)(1)(a).

**{¶66}** When analyzing the factor under R.C. 2151.414(B)(1)(a), the court must determine, at a hearing, if one or more of the factors set forth in R.C. 2151.414(E) exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent. *In re C.C.*, 3d Dist. Marion No. 9-20-06, 2020-Ohio-5138, ¶ 16.  R.C. 2151.414(E).  Specifically, R.C. 2151.414(E) states, in relevant part:

> **In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
>> **(1)   Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining**

> **whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**
>
> **\* \* \***
>
> **(16) Any other factor the court considers relevant.**

R.C. 2151.414(E). The existence of any one of these factors is sufficient to determine that a child cannot be placed with a parent within a reasonable period of time. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, ¶ 10 (8th Dist.), citing *In re William S.*, 75 Ohio St.3d 95 (1996).

{¶67} In the instant case, the trial court found that R.R. cannot be placed with either parent within a reasonable time or should not be placed with either parent for the following reasons:[4]

> **The Court FINDS that Mother clearly lacks the capacity to parent the child. Mother cannot rely on the father of R.R. nor can she rely on her own father as a support and safety net. She cannot keep employment jumping from job to job and does the same with relationships. Despite encouragement from multiple individuals, Mother has not taken full advantage of counseling and continues to struggle. State's Exhibit B was inspected by the Court and**

---

[4] As previously mentioned, Father was chronically absent from the case, failed to participate in any meaningful manner, and eventually asked to be removed from the case plan. The trial court found in its judgment entry granting permanent custody that "Father, in essence, abandoned both Mother and R.R." (Doc. No. 193 at 10). We conclude that the record supports the trial court's determination that Father failed to remedy the circumstances causing R.R. to be removed from the home and further supports the trial court's finding that R.R. cannot be placed with Father within a reasonable time or should not be placed with Father. Moreover, Father's failure to file an appeal from the trial court's grant of permanent custody obviates the need to specifically address the trial court's conclusions with regard to Father's ability to parent R.R.

**coupled with the testimony of Witness Corbett, the Court finds that the information is reliable and admits the same.[5] Exhibit B reflects that Mother had four lapses in time periods when she did not attend counseling sessions.**

**Testimony of other witnesses corroborated this. Mother is not equipped to deal with the needs of the child nor is it likely within a reasonable period of time that she can overcome her challenges. In fact, Mother struggles with meeting her own needs. Even if Mother attended every single counseling appointment, the fact remains that Mother is still struggling with mental health and substance abuse challenges. She also struggles with steady employment and stable housing.**

**\* \* \***

**The Court recognizes that Mother did attain sobriety for approximately a year but relapsed. She also completed her parenting classes. However, she never held a job for any extended period of time and had several short-lived relationships. Mother tested positive on the first day of the hearing and failed to appear for the continued hearing. As a result, the matter was continued and warrant for her arrest was issued. Mother's whereabouts were unknown. To Mother's credit, she did appear at the continued hearing reporting that she returned to live with her father. Maternal grandfather is not supportive and his home had safety concerns which are part of the reviews in this case. Mother argues that she couldn't keep regular counseling appointments and enjoy visitations due to transportation issues. LCCS provides assistance when the parents ask by simply maintaining contact with the Agency and utilizing the services of her attorney. The Court finds this to be an unacceptable excuse on Mother's part.**

**Having considered the factors set forth in (E)(7)-(11) of RC. 2151.414(8)(1)(a), the Court FINDS that R.R. cannot be safely placed with her Father within a reasonable period of time or should not be. The Court also FINDS that R.R. cannot be safely placed with her Mother within a reasonable period of time or**

---

[5] Exhibit B is a service history report from the counseling center documenting Mother's sporadic attendance with her counselor.

> **should not be. Mother has the potential to be a parent but lacks the motivation to abstain from abusing substances and dealing with her mental health challenges at this point in her young adult life. She has no healthy support system and cannot make the necessary behavioral changes within a reasonable period of time to ensure the minor child's safety and best interests.**

(Doc. No. 193 at 8-10).

{¶68} We conclude that the record in this case supports the trial court's conclusion with respect to its findings that R.R. cannot be placed with Mother within a reasonable time or should not be placed with Mother. The record reveals that the primary concerns were Mother's mental health and substance abuse. The record established that the Agency provided ample resources and case planning to help Mother overcome these obstacles in order for her to be reunified with R.R., but Mother failed to consistently put forth the effort to achieve these objectives to remedy the conditions causing R.R. to be placed outside her home. Moreover, despite being offered assistance by the Agency, during the almost two-year history of the case, Mother was unable to maintain stable and safe housing appropriate for R.R.

2. *Best Interest Factors under R.C. 2151.414(D)*

{¶69} Under the second part of the analysis, the best interest of the child, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

**(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;**

**(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶70} Only one of the enumerated factors needs to be resolved in favor of the award of permanent custody. *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30.  No element is greater weight than the rest. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513¶ 56.  Moreover, this is a non-exhaustive list of factors the court must consider. *In re A.M.*, ——Ohio St.3d——, 2020-Ohio-5102, ¶ 19.  The Supreme Court of Ohio recently clarified that a juvenile court is encouraged but not required to expressly discuss each of these best interest factors. *Id*. at ¶ 31-32 (stating "based on the plain and unambiguous statutory language, and consistently with our treatment of the word 'consider' in other contexts, we hold

that R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires.").

{¶71} Here, the juvenile court stated the following in its judgment granting permanent custody to the Agency. Specifically, the trial court stated:

> **The Court, having considered all relevant factors, including those enumerated in 2151.414(D), FINDS that the second prong of the test has been satisfied and FINDS that it is in the best interest of R.R. to be placed into the permanent custody of LCCS. This prong is also supported by clear and convincing evidence.**

(Doc. No. 193 at 14).

{¶72} Based upon our review, we conclude that the record supports the trial court's finding that it is in R.R.'s best interest to grant the Agency's motion for permanent custody. On appeal, Mother blames her immaturity, the depression she experienced after the sudden loss of her mother, and lack of familial support from her father for her shortcomings in meeting the class plan objectives. However, as previously discussed the Agency, and prior to its involvement her probation officer, provided Mother with a litany of resources to assist her in overcoming these obstacles, of which she chose not to take advantage.

{¶73} Every permanent custody case involves the difficult balance between maintaining a natural parent-child relationship and protecting the best interest of a child. However, the juvenile court is duty bound to act in R.R.'s best interest. *In re*

*B.B.* 12th Dist. Clermont No. CA2019-07-057, 2020-Ohio-4007, ¶ 22 (the "paramount consideration" is always the best interest of the child.); *see generally Kelm v. Kelm*, 92 Ohio St.3d 223, 226 (2001) ("[w]ith respect to matters of custody and visitation, the central focus is not, as appellant suggests, the rights of the parents but is, rather, the best interests of the children); *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 35 (stating that "dependent children are entitled to stable, secure, nurturing and permanent homes in the near term, are not required to 'languish' in legally insecure placements for years while natural parents are unwilling or unable to correct serious parenting deficiencies, and their best interest is the pivotal factor in permanency case"); *In re A.R.*, 8th Dist. Cuyahoga No. 103450, 2016-Ohio-1229, ¶ 22 ("A child's best interests require permanency and a safe and secure environment.").

{¶74} The record in this case supports the trial court's conclusion by clear and convincing evidence that a legally secure permanent placement for R.R. cannot be achieved without a grant of permanent custody to the Agency.  Therefore, we do not find that the trial court's decision to grant the Agency's motion for permanent custody of R.R. and to terminate Mother's parental rights is against the manifest weight of the evidence.

{¶75} Accordingly, the second assignment of error is overruled.

*Third Assignment of Error*

**{¶76}** In this assignment of error, Mother argues that the trial court erred in finding that the Agency used reasonable efforts to reunify her with R.R.

*Legal Authority*

**{¶77}** "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29. Under R.C. 2151.419, when a trial court,

> **removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.**

R.C. 2151.419(A)(1).

**{¶78}** Notably, Revised Code 2151.419(A)(1) applies only at " 'adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *.' " *In re L.L.*, 3d Dist. Hancock No. 5-19-33, 2020-Ohio-1565, ¶ 25, *quoting In re C.F.* at ¶ 41. Revised Code 2151.419(A)(1) "makes no reference to a hearing on a motion for permanent custody. Therefore, '[b]y its plain terms, the statute does not apply

to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.' " *In re C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30. However, this does not relieve children services agencies of the duty to use reasonable efforts. *Id.* at ¶ 42. "If [an] agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶79} In this case, the trial court made reasonable-efforts findings on various occasions prior to the permanent custody hearing. For instance, the parties agreed at the depositional hearing that the Agency had used reasonable efforts to eliminate the continued removal of R.R. from the home, which was journalized in the trial court's December 4, 2018 judgment entry. The trial court also made a reasonable efforts finding at an Annual Review, with no objection from Mother. This finding was journalized in the trial court's August 29, 2019 judgment entry. Thus, because the trial court previously made reasonable-efforts findings, the Agency was not required to prove, nor was the trial court required to find, that Agency used reasonable efforts to reunify Mother with R.R. before the trial court could grant permanent custody of R.R. to the Agency. *In re T.A.M.*, 3d Dist. Crawford No. 3-18-13, 2018-Ohio-5058, ¶ 16.

{¶80} This notwithstanding, we find no merit to Mother's contention that the Agency's efforts were not reasonable and we conclude that the record in this case demonstrates that the Agency used reasonable case planning to assist Mother in achieving the goal of reunification with R.R. Accordingly, we find that the Agency's case planning and efforts were reasonable and diligent under the circumstances of this case.

{¶81} Mother's third assignment of error is overruled.

{¶82} Based on the foregoing, the assignments of error are overruled and the judgment is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, J., concurs.**

**/jlr**

**WILLAMOWSKI, P.J. dissents.**

{¶83} I dissent from the majority opinion and would grant the first assignment of error on the basis that the trial court never had jurisdiction in this case as no complaint of dependency was ever filed. "A juvenile court may exercise jurisdiction only if expressly granted the authority to do so by statute." *Rowell v. Smith*, 133 Ohio St.3d 288, 2012-Ohio-4313, ¶ 13, 978 N.E.2d 146 citing Ohio Constitution, Article IV, Section 4(B); R.C. 2301.03(A); and *In re Gibson*, 61 Ohio

St.3d 168, 573 N.E.2d 308 (1991). Subject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case. *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, ¶ 23, 159 N.E.3d 248. "It is a 'condition precedent to the court's ability to hear the case. If a court acts without jurisdiction, then any proclamation by that court is void.'" *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, ¶ 11, 806 N.E.2d 992. "A court's subject-matter jurisdiction is determined without regard to the rights of the individual parties involved in a particular case." *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, ¶ 19, 21 N.E.3d 1040. Rather, the focus is on whether the forum itself is competent to hear the controversy. *See* 18A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE, Section 4428, at 6 (3d Ed.2017) ("Jurisdictional analysis should be confined to the rules that actually allocate judicial authority among different courts").

{¶84} With respect to actions involving alleged dependent children, R.C. 2151.23(A)(1), which governs the jurisdiction of juvenile court, states:

> **(A) The juvenile court has exclusive original jurisdiction under the Revised Code as follows:**
>
> **(1)** ***Concerning any child who on or about the date specified in the complaint*, indictment, or information *is alleged to* have violated section 2151.87 of the Revised Code or an order issued under that section or *to be a* juvenile traffic offender or a delinquent, unruly, abused, neglected, or *dependent child* and, based on and in relation to the allegation pertaining to the child, concerning the parent, guardian, or other person**

**having care of a child who is alleged to be an unruly child for being an habitual truant or who is alleged to be a delinquent child for violating a court order regarding the child's prior adjudication as an unruly child for being an habitual truant \* \* \*.**

R.C. 2151.23(A)(1) (emphasis added).

{¶85} Revised Code Section 2151.27(A)(1) specifies the mechanics for filing a complaint to initiate a dependency action in the juvenile court.

**(A)(1) Subject to division (A)(2) of this section, *any person having knowledge of a child who appears* to have violated section 2151.87 of the Revised Code or to be a juvenile traffic offender or *to be an* unruly, abused, neglected, or *dependent child may file a sworn complaint with respect to that child in the juvenile court of the county in which the child has a residence or legal settlement* or in which the violation, unruliness, abuse, neglect, or dependency allegedly occurred. *If an alleged abused, neglected, or dependent child is taken into custody pursuant to division (D) of section 2151.31 of the Revised Code or is taken into custody pursuant to division (A) of section 2151.31 of the Revised Code without the filing of a complaint and placed into shelter care pursuant to division (C) of that section, a sworn complaint shall be filed with respect to the child before the end of the next day after the day on which the child was taken into custody. The sworn complaint may be upon information and belief, and, in addition to the allegation that the child committed the violation or is an unruly, abused, neglected, or dependent child, the complaint shall allege the particular facts upon which the allegation that the child committed the violation or is an unruly, abused, neglected, or dependent child is based.***

R.C. 2151.27(A)(1) (emphasis added).

{¶86} Several courts, including this one, have held that a juvenile court's subject-matter jurisdiction over dependency actions can only be invoked upon the filing of a complaint in conformity with R.C. 2151.27(A)(1). *See*, *Union Cty. Child*

*Welfare Bd. v. Parker*, 7 Ohio App. 2d 79, 83-84, 218 N.E.2d 757 (3d Dist. 1964) (finding "the proceedings wherein it was determined that the children were dependent and neglected and ordered placed in the temporary custody of the child welfare board were *void ab initio* for the want of a complaint filed as prescribed by Section 2151.27, Revised Code."); *see also*, *In re S.C.*, 9th Dist. Summit No. 27676, 2015-Ohio-2623, ¶ 7 (stating that "the juvenile court's subject matter jurisdiction was established when CSB filed complaints to allege that [the children] were abused, neglected, and dependent children"); *Riley v. Liston*, 12th Dist. Fayette No. CA2005-12-032, 2006-Ohio-5846, ¶ 11 (stating that "it is clear under these statutory provisions that a juvenile court cannot adjudicate a child to be dependent without the filing of a dependency complaint."); *In the Matter Of: Hutchison*, 4th Dist. Lawrence No. 1537, 1982 WL 3455 (June 10, 1982) (stating "R.C. 2151.23(A)(1) confers jurisdiction respecting neglected and dependent children. R.C. 2151.27 which sets forth complaint requirements and R.C. 2151.03 and [R.C. 2151].04 defining neglected and dependent children are in *pari materia*, and the jurisdiction of the Juvenile Court is invoked only when a proper, verified complaint is filed in accordance with the law").

{¶87} Here no complaint was filed to invoke the juvenile court's subject-matter jurisdiction over the dependency action. Rather, the first document that appears in the trial court's docket in the dependency matter is the August 6, 2018,

judgment entry adjudicating R.R. dependent and designating the Agency as her temporary legal custodian. (Doc. No. 1). The record indicates that the trial court exercised its authority to take custody of R.R. at Mother's probation violation hearing, involving another case, upon ordering Mother to the custody of JDC for 22 days for the probation violation. The probation violation proceedings are not part of the record in this case. This notwithstanding, the record in this case indicates that the trial court determined R.R. to be dependent at Mother's juvenile probation hearing.

{¶88} Although the Agency concedes that no formal complaint was filed in this case, it argues that the trial court acted within its statutory authority to take custody of R.R. under R.C. 2151.31(A)(3)(b) at the probation violation hearing and then claims that the juvenile court's subject-matter jurisdiction over the dependency case was properly invoked under this statutory subsection. R.C. 2151.31 governs the ways in which a child can be apprehended, detained, or taken into custody. Specifically, R.C. 2151.31(A)(3)(b) states as follows:

> **(A) A child may be taken into custody in any of the following ways:**
>
> **\* \* \***
>
> **(3) By a law enforcement officer or duly authorized officer of the court when any of the following conditions are present:**
>
> **\* \* \***

**(b) There are reasonable grounds to believe that the child is in immediate danger from the child's surroundings and that the child's removal is necessary to prevent immediate or threatened physical or emotional harm * * *.**

R.C. 2151.31(A)(3)(b). I do not disagree with the Agency that a juvenile court judge may be considered a "duly authorized officer of the court" under the statutory language above, and that R.C. 2151.23(A)(8) specifically confers jurisdiction to the juvenile court "[c]oncerning any child who is to be taken into custody pursuant to section 2151.31 of the Revised Code, upon being notified of the intent to take the child into custody and the reasons for taking the child into custody * * *." R.C. 2151.23(A)(8). However, while these statutes *generally* confer a limited time jurisdiction to the juvenile court to take custody of a child under these circumstances, they do not invoke the juvenile court's *specific* jurisdiction over an alleged dependent child. Rather, as noted above, R.C. 2151.23(A)(1) of the jurisdictional statute specifically confers jurisdiction to a juvenile court over an alleged dependent child upon the filing of a sworn complaint. *See* R.C. 2151.23.

{¶89} Even R.C. 2151.31, the statute which authorized the trial court to take custody of R.R. at the probation violation hearing, specifically requires a complaint be filed once an alleged dependent child is taken into custody pursuant to R.C. 2151.31(A)(3)(b).

**(D) Upon receipt of notice from a person that the person intends to take an alleged abused, neglected, or dependent child into custody pursuant to division (A)(3) of this section, a juvenile judge**

-44-

**or a designated referee may grant by telephone an ex parte emergency order authorizing the taking of the child into custody if there is probable cause to believe that any of the conditions set forth in divisions (A)(3)(a) to (c) of this section are present. The judge or referee shall journalize any ex parte emergency order issued pursuant to this division.** _**If an order is issued pursuant to this division and the child is taken into custody pursuant to the order, a sworn complaint shall be filed with respect to the child before the end of the next business day after the day on which the child is taken into custody and a hearing shall be held pursuant to division (E) of this section and the Juvenile Rules.**_ **A juvenile judge or referee shall not grant an emergency order by telephone pursuant to this division until after the judge or referee determines that reasonable efforts have been made to notify the parents, guardian, or custodian of the child that the child may be placed into shelter care and of the reasons for placing the child into shelter care, except that, if the requirement for notification would jeopardize the physical or emotional safety of the child or result in the child being removed from the court's jurisdiction, the judge or referee may issue the order for taking the child into custody and placing the child into shelter care prior to giving notice to the parents, guardian, or custodian of the child.**

R.C. 2151.31(D) (emphasis added). Thus, the requirement of filing a sworn complaint to properly invoke the juvenile court's jurisdiction over an alleged dependent child becomes more apparent when reading R.C. 2151.23, the statute governing the juvenile court's jurisdiction, with R.C. 2151.31, the statute generally governing the juvenile court's authority to take custody of a child.

{¶90} When examining R.C. 2151.27, the statute governing a complaint filed in juvenile court, which is fully cited above, the following is specified with respect to an alleged dependent child taken into custody under R.C. 2151.31:

> *** If an alleged abused, neglected, or dependent child is taken
> into custody pursuant to division (D) of section 2151.31 of the
> Revised Code or is taken into custody pursuant to division (A) of
> section 2151.31 of the Revised Code without the filing of a
> complaint and placed into shelter care pursuant to division (C) of
> that section, a sworn complaint shall be filed with respect to the
> child before the end of the next day after the day on which the
> child was taken into custody ***.**

R.C. 2151.27(A)(1). Based on the foregoing, I would hold that the trial court properly exercised its limited time statutory authority when it took R.R. into the emergency shelter care under R.C. 2151.31(A)(3)(b). However, that authority did not confer jurisdiction to the trial court to adjudicate R.R. dependent without a complaint alleging dependency being filed first.

{¶91} I note that the Agency argues that the trial court's August 6, 2018, judgment entry adjudicating R.R. dependent should be construed as a complaint under R.C. 2151.27(A)(1). I do not find this argument persuasive. The August 6, 2018, judgment entry constituted a conclusive adjudication of dependency rather than a vehicle to provide notice of an allegation of dependency thereby triggering the statutory due process procedures accorded a parent and a child involved in an alleged dependency action under R.C. 2151.28, which for example requires a shelter care hearing to take place within 72 hours after the complaint is filed and requires an adjudicatory hearing to be held no later than 30 days after the complaint is filed where the parent or child can challenge the dependency allegations. *See* R.C. 2151.28 (A). Basically, in this case the trial court held an emergency hearing at the

probation violation hearing. This triggered the requirement that the Agency file a complaint or risk having the prior order expire after 72 hours. The Agency never followed through with the statutory requirements. Without the procedural safeguards, no proper adjudication hearing was held and Mother had no notice of the dependency hearing, no opportunity to prepare a defense, and no ability to appeal from this judgment as an emergency hearing is not a final appealable order. Instead, the matter was treated as completed without a hearing as to the finding of dependency and the matter proceeded directly to a dispositional hearing on the prior adjudication of dependency. This is a substantial denial of Mother's due process rights. Without the filing of a complaint, the trial court's jurisdiction expired with the emergency order and was never invoked again.

{¶92} Accordingly, I would find that the trial court's jurisdiction to adjudicate R.R. dependent was never properly invoked under R.C. 2151.23(A)(1) because no complaint under R.C. 2151.27 was filed to initiate the statutory due process in place under R.C. 2151.28. The trial court was without subject-matter jurisdiction to hear the case and all subsequent hearings were a nullity. *See*, *In re Corey*, 145 Ohio St. 413, 61 N.E.2d 892 (1945), paragraph one of the syllabus (construing a prior version of the statute and stating that "the parents of a minor child or children are entitled to notice, actual or constructive, in a proceeding instituted in the Juvenile Court upon a complaint of dependency of such children.

Unless such notice is given to the parents, the jurisdiction of the court does not attach and a judgment of commitment rendered in such proceeding is void);" *State ex rel. Clark v. Allaman*, 154 Ohio St. 296, 95 N.E.2d 753 (1950) (construing a prior version of the statute and concluding that "a judgment by the Juvenile Court finding that such child is a dependent child, made without the filing of a complaint against the parents, is *void ab initio* for lack of jurisdiction"); *Union Cty. Child Welfare Bd. v. Parker*, 7 Ohio App. 2d 79, 83-84, 218 N.E.2d 757 (3d Dist. 1964).  I would thus grant Mother's first assignment of error and reverse the judgment of the trial court.